952 F.2d 1230
 60 USLW 2423, 26 Collier Bankr.Cas.2d 443,Bankr. L. Rep. P 74,387
 In re KAISER STEEL CORPORATION, Debtor.KAISER STEEL CORPORATION; Kaiser Steel Resources, Inc.,formerly known as Kaiser Steel Corporation,Plaintiffs-Appellants,v.PEARL BREWING COMPANY; Falstaff Brewing Company;Oppenheimer & Co. Inc.; Josephthal & Co., Josephthal & Co.Incorporated; the Hillman Co., Individually and as Trusteefor the N.M.U. Pension Trust; Herzfeld & Stern; Herzfeld &Stern Inc., now known as JII Securities, Inc.; GoldmanSachs & Co.; A.G. Becker Paribes Inc., now known as MerrillLynch Money Market, Inc.; A.G. Edwards & Sons, Inc.;Alpine Associates; Asiel & Co.; Bankers Trust Company;Barclay's Bank International Limited; Bear Stearns & Co.,individually and as custodian for the IRA Account of RobertW. Sabes; Bradford Trust Co.; Cowen & Co.; CrockerNational Bank; Dain Bosworth, Inc.; Dillon Read & Co.,Inc., individually and as General Partner of B/DR ArbitrageFund Limited Partnership; Doft & Co., Inc.; Drexel BurnhamLambert, Inc.; Easton & Co.; Edward A. Viner & Co., Inc.,now known as Fahnestock & Co.; Edward D. Jones & Co.;Engler & Budd Company; Eppler, Guerin & Turner, Inc.;Ernst & Company; Evans & Co., Inc.; Fifth Third Bank;First Kentucky Trust Company; Herzog, Heine, Geduld, Inc.;Huntington National Bank; Kellner, Dileo & Co.; Kidder,Peabody & Co.; L.F. Rothschild Unterberg, Towbin, now knownas L.F. Rothschild & Co., Inc.; Lafer Amstar & Co., nowknown as Amstar & Co.; Laidlaw Adams & Peck, Inc.; Manley,Bennett, McDonald & Co.; Manufacturers National Bank ofDetroit, individually and as Trustee for ManufacturersExtended Index Fund; Marcus Schloss & Co., Inc.; MarineMidland Bank, N.A.; Marine Midland Bank; Moore & Schley,Cameron & Co.; Morgan Guaranty Trust Company; Morgan,Olmstead, Kennedy & Gardner, Inc., now known as WedbushMorgan Securities; Newhard, Cook & Co., Incorporated;Oscar Gruss & Son, Inc.; Paine, Webber, Jackson & Curtis,Inc., now known as Paine Webber, Incorporated; Q & RClearing Corporation; R.L. Tucker, Anthony & Day, Inc.,also known as Anthony Tucker & R.L. Day, Inc.; RegionalClearing Corp.; S.B. Lewis & Co.; Sanford C. Bernstein &Co., Inc.; Securities Settlement Corp.; Shawmut Bank ofBoston, N.A.; SLK-SEG; Smith, Barney, Harris, Upham & Co.,Inc.; Southwest Securities, Inc.; SSB-Custodian, alsoknown as State Street Bank and Trust Co., Individually andas Trustee for American Telegraph and Telephone PensionFund; Sutro & Co., Inc.; Swiss American Securities, Inc.;Swiss Bank Corporation; Thomson McKinnon Securities, Inc.;United States Trust Company of New York; Walwyn StodgellCochran Murray, Limited; Weedbrush, Noble & Cooke, Inc.,now known as Wedbush Morgan Securities; Wells Fargo Bank,N.A.; Baily Gordon Securities, now known as Gordon Capital;First Arbitrage Partnership, now known as BrenzelBirkenshaw Capital, Inc.; American National Bank and TrustCompany of Chicago; Alan Bush, now known as J.W. CharlesBush, Securities Inc.; K.J. Brown & Co., Inc.; MillikinNational Bank of Decatur; O'Connor Securities; Stephens,Inc., now known as Stephens Group, Inc.; Larkin & Co.;SAIC/SNY; Somers Grove; and the First Boston Corporation,Defendants-Appellees,andSecurities Exchange Commission, Appellees,andAdvest, Inc.; Atlantic Capital Corp., now known as DeutscheBank Capital Corp.; Bank of Montreal; Bank of New England,N.A.; Brown Brothers Harriman & Co.; Chemical Bank; DeanWitter Reynolds, Inc.; Fahnestock & Co.; First AlbanyCorp.; Jefferies & Company, Inc.; Kalb, Voorhis & Co.;Lewco Securities Corp.; Mabon, Nugent & Co.; Manufacturers& Traders Trust Co.; Merrill, Lynch, Pierce, Fenner andSmith, Inc.; McLeod Young Weir, Limited; NationalFinancial Services Corp.; Pacific Brokerage Services;Piper Jaffray & Hopwood, Inc.; Spear Leeds & Kellogg;Tweedy Browne Clearing Corp.; Burke Christensen & LewisSecurities, Inc.; Continental Bank; I.M. Simon & Co.;Emette Larkin & Co., Defendants.KAISER STEEL RESOURCES, INC., formerly known as Kaiser SteelCorporation, Plaintiff-Appellant,v.ACTION TRADERS, INC., now known as ATI Corporation; John A.Alden, M.D., & Ann Alden; Altona Holdings, Ltd.; AmericanFletcher Bank Suisse, now known as Merrill LynchInternational Bank (Suisse), S.A.; Herbert M. Ames;Lillian Ames; Robert Stabler, individually and as trusteefor the Amesbury Fund; W.H. & S.C. Amesbury, Individuallyand as Trustees for u/w/o Jane Winton & f/b/o Scott Winton;William H. Amesbury; Arshot Investment Corporation; BankOppenheim Pierson; IRA Account of Robert W. Sabes, andRobert W. Sabes, Individually; Lyle A. Berman; Janis R.Berman; John C. Bondurant; Doris Bondurant; BuildingService Employees Retirement Pension Fund Local 32E, AFL-CIOTN UA 06/15/55 and its Trustee; Broadway Realty Co.;Bullett Bay International Co. N.V.; Barbara Barrett Busby,individually and as trustee FBO Barbara B. Busby RevocableTrust UTD DTD; Cascade Fund, a limited partnership;Wilfred Clegg; Vera Clegg, individually and as co-trusteesfor the Clegg Family Trust UDT DTD 5/14/71; CollegeRetirement Equities Fund; Thomas Conway; Judith AnnCotton; Sumner Cotton; Curtis Associates, Inc.,individually and as trustee for the Pension Trust and theRetirement Trust; Alan Curtis, individually and as trusteefor the Pension Trust and the Retirement Trust; AlanCurtis, individually and as trustee for the Alan Trust andthe Curtis Trust; Daper Realty Inc.; Decisions, Inc.;Delbrueck & Co.; B/DR Arbitrage Fund Limited Partnershipand Bessemer Securities Corporation as its Limited Partner;Elisabeth H. Doft; Alan Doft; E.F. Brady Company; Easton& Co.; A.G. Ellis; Jacquelyn Esco; Wells Fargo Bank,individually and as trustee of Exxon Corp. Annuity TrustFund; Mary Fullerton Farr; Femirol Overseas S.A.; WilliamBarry Furlong; Isabel Furlong; GSC of Nevada, Inc.;Charles R. Gesme; Henry Goode; Goode-Adel Partnership;Sam V. Gordon; Anita V. Gordon; Sam V. Gordon, doingbusiness as Gordon Enterprises; Sheldon I. Greenberg;Gordon Grender; Bankers Trust, individually and as Trusteefor GTE Service Corp., also known as GTE High Yield Account;Hambros Bank, Ltd.; Jacob Harris, M.C., P.C. DefinedBenefit Pension Trust and its Trustee; Warren Harrison;Doris Grunwald; Karin Heine; Peggy Heine, co-executrixesof the Estate of Max L. Heine and Estate of Charlotte Heine;Herman Wilson Lumber Company; Joseph Iny; Mrs. JosephIny; Richard O. Jacobson; Sarah T. Jacobson; PaulJacobson; Deborah F. Cooper; Lillian Gibson; PaulSchryver, as successor trustees to Eve B. Jarvis as trusteeUA 07/01/64 Airlie Trust; Paul G. Jende; Arlene M. Jende;Clara Kellner; George A. Kellner; John Doe Trustee,individually and as trustee for the Keystone AggressiveStock Trust; Individually and as Trustee for the KeystoneCustodian Fund S-4; Kinsdale Partners; Sidney Kisin;Edmund Klein; Norma Klein; Ezra Kotcher; Dorothy Kotcher;W. Donald Larson; Francis W. Lawrence, individually and astrustee for u/a D.T.D. 12/30/81, Derald H. RuttenbergCharitable Lead Annuity Trust; Les Fils Dreyfus & CIE S.A.;Hugh T. Lindsay; Mrs. Hugh T. Lindsay; James K. Lindsay;Mrs. James K. Lindsay; M.H. Davidson & Co.; Maerki Baumann& Co., A.G.; Leo Mainemer; Ester Mainemer; Elliot Marple;Barbara K. Marple; Wilbert K. Martin; Elizabeth M.Martin; Ivor Massey, Jr.; Jane Doe Massey; John B.McDonald; Elaine McKelvey; Robert D. McLean; Mrs. RobertD. McLean; Mercury Securities, Inc.; Midland Bank PrincessStreet, Nominees Limited; Moseley, Haugarten, Estabrook &Weeden, Inc., also known as Mosely Securities; Mount SinaiMedical Center, Inc.; Moussard S.A.; Michael Muller; ElkeM. Muller; Nerval & Manor; Number Seven Account, and itsTrustee (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); T 98 ARB 1980, Account # 000-01198with Oscar Gruss & Sons, Inc.; John D. Picchetti; MargaretM. Picchetti; Picchetti, Inc.; Al I. Pollack; BeverlyPollack; R.P. Richards, Inc.; Research Charitable Trust,and its Trustee; R.J. Scheuer & Co.; E. Franklin Robbins &Jane Doe Robbins; Robert Fleming, Inc., now known asFlemings North America Inc.; Royal Bank of Scotland PLC, astrustee for RBOS-TT-UTS All Sun Amer Spec; Royal Bank ofScotland PLC, as trustee for RBOS-TT-UTS All Dun Intl Fund;Royal Bank of Scottsdale PLC, as trustee for RBOS-TT-UTS AllDun Intl Fund; Royal Bank of Scotland PLC, as trustee forRBOS-TT-UTS All Dun Sec Amr Tr; Royal Investment Company;S. Paul Posner & Co.; Saltzman Partners; San FranciscoMuseum of Modern Art; Gene L. Schumacher; Mrs. Gene L.Schumacher; Sequoia Ins. Corp.; Marjorie Shamgochian andthe Estate of Heront Shamgochian; J.R. Simplot; EstherSimplot; Soberano Oceanico; Mary Amesbury Stabler; RobertC. Stabler; Robert C. Stabler, individually and as trusteeu/a/d f/b/o L. Stabler; John Stavick; STE JeanesCorporation; Jackson T. Stephens; Mary Anne Stephens;Robert S. Strauss, individually and as trustee of the RobertS. Strauss, P.C. Defined Benefit Plan; TR 30, a New YorkPartnership; Ultramar Travel Bureau Profit Sharing Trust,UA 11-10-67 and its Trustee; Unicorp Canada Corporation;Universal Life Church, Inc. Charter, 30488 and Bayard Ryder;Warm Springs Associates; Warner W. Henry, individually andas trustee FBO Henry Family Trust UDT DTD 12/04/82; WarudaHoldings, Ltd.; Abraham Weiss; Ruth Weiss; Wells FargoBank, individually and as trustee of the Extended MarketFund for EBT, 368-500069 and its Participants; Wells FargoBank, individually and as trustee for Walter LeBand Trust(or Francine LeBand, individually and as executor for theEstate of Walter LeBand); Jeffrey Wendel; WertheimSchroder & Co., Inc.; Wheel Barrow & Co.; Wift & Co.;Harry Wilf; Joseph Wilf; Y Partnership; Z.H. Associates;Estate of Gerald L. Conrad, doing business as Conrad SalesCo.; McCosker Partners; and the First Boston Corporation,Defendants-Appellees,andSecurities Exchange Commission, Appellee,andJoseph H. Whitney, Defendant.
 Nos. 90-1243, 90-1245.
 United States Court of Appeals,Tenth Circuit.
 Dec. 30, 1991.
 
 John P. Frank of Lewis and Roca, Phoenix, Ariz. (Marty Harper and Susan M. Freeman of Lewis and Roca, Phoenix, Ariz., G. Stephen Long and David J. Richman of Coghill & Goodspeed, Denver, Colo., on the briefs), for appellants.
 David I. Blejwas of Hahn & Hessen, New York City for Bear Stearns & Co., Inc., Cascade Fund, Cowen & Co., Inc., Elisabeth and Alan Doft, Doft & Co., Inc., L.F. Rothschild & Co., Inc., M.H. Davidson & Co., Inc., Smith Barney, Harris Upham & Co. Inc., and Herzog, Heine & Geduld, Inc. (Robinson B. Lacy and Michael T. Tomaino, Jr. of Sullivan & Cromwell, New York City, for Asiel & Co., Bank of Montreal, Barclays Bank PLC, Deutsche Bank Capital Corp., Flemings North America Inc., Goldman, Sachs & Co., Gordon Capital Corp., Kidder, Peabody & Co. Inc., Marcus Schloss & Co., Inc., S B Lewis & Co., and ScotiaMcLeod, Inc., Rosanne M. Thomas of Hahn & Hessen, New York City, for Bear Stearns & Co., Inc., Cascade Fund, Cowen & Co., Inc., Elisabeth and Alan Doft, Doft & Co., Inc., L.F. Rothschild & Co., Inc., M.H. Davidson & Co., Inc., Smith Barney, Harris Upham & Co. Inc., and Herzog, Heine & Geduld, Inc., Barry L. Wilkie of Shaw, Spangler & Roth, Denver, Colo., for Advest, Inc., A.G. Edwards & Sons, Inc., Eppler, Guerin & Turner, Marine Midland Bank, N.A., Southwest Securities, Inc., Sutro & Co., Inc., and U.S. Clearing Corp., Mark A. Weisbart of Akin, Gump, Strauss, Hauer & Feld, Dallas, Tex., for Robert S. Strauss, Individually and as Trustee for the Robert S. Strauss, P.C. Defined Benefit Plan, Mark W. Grobmyer and Charles D. McDaniel of Arnold, Grobmyer & Haley, Little Rock, Ark., for Stephens Group, Inc., Jackson T. Stephens, and Mary Anne Stephens, Charles B. Hecht of Baker & Hostetler, Denver, Colo., for Mabon, Nugent & Co., P. Kevin Castel and Susan E. Harkins of Cahill Gordon & Reindel, New York City, for B/DR Arbitrage Fund, Alan Curtis, Curtis Associates Inc., Dillon, Read & Co. Inc., Goode-Adel Partnership, Trustee of Keystone Aggressive Stock Trust and Trustee of Keystone Custodian Fund, Series S-4, Jeremiah B. Barry of Delap & Barry, Denver, Colo., for John A. Alden, M.D., Ann Alden, Herbert M. Ames, Lillian, Ames, IRA Account of Robert W. Sabes, Robert W. Sabes, Individually, Lyle Berman, Janis R. Berman, John C. Bondurant, Doris Bondurant, Doris Grunwald, Karin Heine and Peggy Heine as Co-executrices of the Estate of Max Heine, Herman Wilson Lumber Co., Sarah and Paul Jacobson, Deborah F. Cooper, Lillian Gibson, and Paul Schryver, as successor trustees to Eve B. Jarvis, as trustee UA 07/01/64 Airlie Trust, Paul G. Jende, Arlene M. Jende, Ivor Massey, Jr., Al I. Pollack, Beverly Pollack, San Francisco Museum of Modern Art, Harry Wilf, Joseph Wilf, and Estate of Gerald L. Conrad d/b/a Conrad Sales Co., Harold A. Feder of Feder, Morris, Tamblyn & Goldstein, Denver, Colo., for Stephens Group, Inc., Jackson T. Stephens, and Mary Anne Stephens, Martin P. Unger and Ann Parry of Gaston & Snow, New York City, for Securities Settlement Corp., William M. Bitting of Hill, Farrer & Burrill, Los Angeles, Cal., for Pearl Brewing Co. and Falstaff Brewing Corp., William G. Imig and Neil S. Cohen of Ireland, Stapleton, Pryor & Pascoe, Denver, Colo., for Chemical Bank, Dean Witter Reynolds Inc., Merrill Lynch, Pierce, Fenner & Smith Inc., and PaineWebber Inc., Norman D. Haglund of Kelly/Haglund/Garnsey & Kahn, Denver, Colo., for Pearl Brewing Co. and Falstaff Brewing Corp., Jeffrey A. Kehl of McGuire & Tiernan, New York City, for Alpine Associates, Kellner, DiLeo & Co., Clara Kellner, George A. Kellner, Warm Springs Limited Partnership, and ZH Associates. Sarah Donna Black of Morrato, Burrus & Colantuno, P.C., Englewood, Colo., for Sidney Kisin, Elliot Marple, and Jeffrey Wendel; R. Daniel Scheid and Richard G. Sander of Popham, Haik, Schnobrich & Kaufman, Denver, Colo., for Amster & Co. Ronald S. Rauchberg and Nancy F. Brodie of Proskauer Rose Goetz & Mendelsohn, New York City, for Hillman Co., individually and as Trustee for the NMU Pension Trust, and the Estate of E. Franklin Robbins; Roger Pascal and Duncan G. Harris of Schiff Hardin & Waite, Chicago, Ill., for O'Connor Securities; Jeremy G. Epstein and Michael W. Jahnke of Shearman & Sterling, New York City, for Lewco Securities Corp. and Wertheim Schroder & Co. Inc.; James A. Shpall of Wolf & Slatkin, P.C., Denver, Colo., for Securities Settlement Corp., with him on the briefs), for appellees.
 Katherine Gresham of the U.S. Securities and Exchange Com'n, Washington, D.C. (Rosalind C. Cohen and Joseph H. Harrington of the U.S. Securities and Exchange Com'n, Washington, D.C., and Thomas D. Carter, Regional Trial Counsel, Securities and Exchange Commission, Denver, Colo.), for Securities and Exchange Com'n.
 Joseph Meyer, III, and Michael E. Romero of Pendleton & Sabian, P.C., Henry L. Hobson and Lynn Bolinski of Holland & Hart, Denver, Colo., Douglas M. Schwab and Joseph A. Gross of Heller, Ehrman, White & McAuliffe, San Francisco, Cal., and Jack Corinblit and Marc M. Seltzer of Corinblit & Seltzer, Los Angeles, Cal., for remaining defendants in consolidated cases.
 Before HOLLOWAY, ANDERSON and BRORBY, Circuit Judges.
 STEPHEN H. ANDERSON, Circuit Judge.
 
 
 1
 The question presented in this appeal is whether consideration paid to shareholders for their stock in connection with a leveraged buy out is exempt from the avoiding powers of a trustee under section 546(e) of the Bankruptcy Code, as "settlement payments" made "by or to a ... stockbroker, financial institution, or securities clearing agency." 11 U.S.C. § 546(e). In its order granting defendants' motion for summary judgment, the district court held that such payments fall within the exemption found in section 546(e). We agree and, therefore, affirm the judgment of the district court.
 
 I. INTRODUCTION
 
 2
 This case involves a leveraged buy out gone bad. Making use of the modern counterpart of a centuries-old statute, Kaiser Steel Resources, Inc. ("Kaiser"), formerly known as Kaiser Steel Corporation ("Kaiser Steel"), seeks in the underlying action to retrieve amounts paid out to former Kaiser Steel shareholders in connection with a leveraged buy out of the company in 1984 (the "LBO"). Kaiser makes the relatively novel yet increasingly popular claim that these payments constitute a fraudulent conveyance. The current battle is much more narrow, however. It surrounds the construction of a Bankruptcy Code (the "Code") exemption that prohibits the trustee from avoiding "settlement payments" made by or to stockbrokers, financial institutions, and clearing agencies. See 11 U.S.C. § 546(e). Appellees, joined by the Securities and Exchange Commission ("SEC"),1 maintain that the section 546(e) exemption encompasses amounts paid to the shareholders in the LBO and accordingly prevents Kaiser from unwinding the transaction.
 
 
 3
 A. The Leveraged Buy Out.
 
 
 4
 In late 1983, the board of directors of Kaiser Steel agreed to the LBO. Under the plan, Kaiser Steel would merge with a new entity owned by a group of outside investors. Upon the merger, all outstanding shares of Kaiser Steel common stock would be converted into the right to receive twenty-two dollars and two shares of preferred stock (the "LBO consideration") in the surviving entity. The money, which amounted to $162 million, was to come from Kaiser Steel's cash reserves and a $100 million loan from Citibank secured by the corporation's assets.
 
 
 5
 The shareholders approved the LBO on January 18, 1984. As of the effective date of the merger, February 29, 1984, the former holders of Kaiser Steel common stock were required to tender their shares to Kaiser's disbursing agent, Bank of America, in order to receive the cash and preferred stock. The New York Stock Exchange delisted the stock the following day.
 
 
 6
 Most of the common stock was in the possession of Depository Trust Company ("DTC"), a securities clearing agency acting as depository. After the merger, DTC tendered the certificates to Bank of America and received the payments of LBO consideration. DTC then transferred these payments to the accounts of its participants, including brokers and other financial intermediaries. These intermediaries, in turn, either disbursed the payments to their customers who were the beneficial owners of Kaiser Steel stock or retained the payments if they themselves were the beneficial owners. Some shares were exchanged through securities clearing agencies other than DTC, and since DTC stopped handling trades of Kaiser Steel shares prior to the effective date of the LBO, some financial intermediaries and beneficial owners were required to tender their shares directly to Bank of America.
 
 
 7
 B. History of the Case.
 
 
 8
 In 1987, Kaiser filed a voluntary reorganization proceeding under Chapter 11 of the Code. Kaiser then commenced this fraudulent conveyance action against a number of defendants, seeking to avoid the LBO and recover the $162 million. In what amounted to a test case, Charles Schwab & Co. ("Schwab"), a broker eventually named in the action, moved for summary judgment on the grounds that it was not liable because it was a "mere conduit" rather than a transferee, see 11 U.S.C. § 550(a). The argument was also made by intervening defendants that the LBO payments were exempt from avoidance as settlement payments, see 11 U.S.C. § 546(e). Schwab's only role in the transaction was to deliver its customers' Kaiser Steel shares for payment and transfer the payments it received back to the accounts of its customers.
 
 
 9
 On appeal, following the district court's reversal of the bankruptcy court's decision to deny Schwab's summary judgment motion, we held that the payments to Schwab were settlement payments exempt from recovery under section 546(e). Kaiser Steel Corp. v. Charles Schwab & Co., 913 F.2d 846 (10th Cir.1990). Because we affirmed the district court's decision on these grounds, we did not decide whether Schwab was a "mere conduit" rather than a transferee. Id. at 848.
 
 
 10
 Pending that appeal, in consolidated proceedings before the district court, other financial intermediaries moved for summary judgment on the basis of the section 546(e) settlement payment exemption. The district court granted summary judgment dismissing all claims asserted against the financial intermediaries and sua sponte dismissed the claims asserted against all other defendants, including beneficial shareholders of Kaiser Steel stock and brokers trading on their own account.2 In light of our decision in Schwab, Kaiser has abandoned all claims against the appellees in this case insofar as they acted in conduit/financial intermediary capacities. Therefore, all appellees remaining before us are shareholders or brokers that beneficially owned the Kaiser Steel shares tendered in connection with the LBO.
 
 II. DISCUSSION
 
 11
 We now must decide whether our holding in Schwab --that Code section 546(e) protected payments made to the financial intermediaries--should be extended to protect payments made to the beneficial shareholders.
 
 Section 546(e) provides as follows:
 
 12
 the trustee may not avoid a transfer that is a margin payment, as defined in section 101(34), [sic (38) ] 741(5) or 761(15) of this title, or settlement payment, as defined in section 101(35) [sic (39) ] or 741(8) of this title, made by or to a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency....
 
 
 13
 11 U.S.C. § 546(e) (emphasis added).
 
 
 14
 Kaiser makes two primary arguments against applying this provision to the payments of LBO consideration. First, it maintains that these payments are not "settlement payments." Second, it insists that even if the payments are settlement payments, payments made "by or to" one of the enumerated entities are protected under section 546(e) only to the extent the recipient is a participant in the clearance and settlement system (i.e., a stockbroker, financial institution, clearing agency, or some other participant). Settlement payments received by an "equity security holder," according to Kaiser, are not protected.
 
 
 15
 A. Settlement Payments.
 
 
 16
 We cannot accept Kaiser's argument that the payments of LBO consideration to the beneficial shareholders are not settlement payments within the meaning of the statute. Our interpretation, as always, begins with the language of the statute itself. Section 546(e) refers to section 741(8) for the definition of "settlement payment."3 Section 741(8), in turn, defines "settlement payment" as a "preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade." 11 U.S.C. § 741(8) (emphasis added).
 
 
 17
 As a natural reading suggests, and as we and others have noted, this definition is "extremely broad." Schwab, 913 F.2d at 848 (quoting Bevill, Bresler & Schulman Asset Management Corp. v. Spencer Sav. & Loan Ass'n, 878 F.2d 742, 751 (3d Cir.1989)). See also In re Comark, 124 B.R. 806, 816 (Bankr.C.D.Cal.1991); Blanton v. Prudential-Bache Sec., Inc., 105 B.R. 321, 347 (Bankr.E.D.Va.1989). The clear aim of the definition is to encompass all "settlement payments" commonly used in the securities trade. Schwab, 913 F.2d at 848. See Bankruptcy of Commodity and Sec. Brokers: Hearings before the Subcomm. on Monopolies and Commercial Law of the Comm. on the Judiciary of the House of Representatives, 97th Cong., 1st Sess. 372 (1981) (1981 Hearings ) (the commodities and securities industry representatives that drafted and proposed the definition explain that: "This new section is added to provide a definition for the term 'settlement payment' to include the several types of settlement payments commonly used in the securities industry.").
 
 
 18
 In applying this provision, our task is to apply the term "settlement payment" according to its plain meaning. See, e.g., Resolution Trust Corp. v. Westgate Partners, Ltd., 937 F.2d 526, 529 (10th Cir.1991) ("The exceptions to our obligation to interpret a statute according to its plain language are few and far between." (Citing United States v. Ron Pair Enterprises, 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) (plain language conclusive unless it produces a result "demonstrably at odds with the intention of its drafters")). However, since even the plain meaning of a term may depend on the context within which it is given, we must interpret the term "settlement payment" as it is plainly understood within the securities industry. See Shell Oil Co. v. Iowa Dep't of Revenue, 488 U.S. 19, 25, 109 S.Ct. 278, 281, 102 L.Ed.2d 186 (1988) (A court need not look beyond the plain meaning of a statute. "But the meaning of words depends on their context."); McCarthy v. Bronson, --- U.S. ----, 111 S.Ct. 1737, 1740, 114 L.Ed.2d 194 (1991) ("However, statutory language must always be read in its proper context.").
 
 
 19
 With respect to the routine purchase and sale of a security, there are at least two opportunities for "settlement."4 The first ("street-side settlement") takes place between the brokers and the clearing agency during the process of clearance and settlement. The brokers submit their transactions which are matched and compared. Confirmed contracts are submitted to the clearing agency's accounting functions, and the obligations created under the separate trades are netted to arrive at each clearing member's "settlement obligations." On the "settlement date" (normally five days after the trade date) the brokers and the clearing agency, which has interposed itself between the selling broker and the buying broker, will deliver securities and receive payment. "Settlement payments" are those payments made in discharge of a party's settlement obligations. See Division of Market Regulation, Securities and Exchange Commission, The October 1987 Market Break at 10-5 (1988) (SEC Report ); Dale A. Oesterle, Comment on the Harris Paper, 74 Cornell L.Rev. 943, 944 (1989) ("Settlement payments refer to the final payment of funds between clearing house [members] for trade[s] registered up to a specific point in time.").5
 
 
 20
 In addition, a "customer-side settlement" also occurs between the broker and its customer. See SEC Report at 10-2, 10-10 to 10-11; New York Stock Exchange, Language of Investing Glossary 30 (1981) (defining settlement as "[c]onclusion of a securities transaction when a customer pays a broker/dealer for securities purchased or delivers securities sold and receives from the broker the proceeds of a sale"); J. Low, The Investor's Dictionary, 169 (1964) ("Settlement day is the day by which a buyer of securities must pay his broker for his purchases and a seller must deliver to his broker negotiable certificates for any securities he has sold."). Logically, the term "settlement payment" may also be used to describe payments made to settle a customer's account with its broker. Cf. 1981 Hearings at 294 (Statement by Jack Nelson, President, National Securities Clearing Corporation) ("Prior to the Code, the securities industry knew for certain that margin, mark-to-market, deposit and settlement payments made by a securities customer or broker to a clearing broker or a clearing agency ... could not be voided"); id. at 492 (Statement by the Securities Industry Association) (referring to the "traditional right of brokers and their clearing agencies to close out the accounts of insolvent brokers and customers to retain margin, mark-to-market and settlement payments").
 
 
 21
 No party before us, including Kaiser, argues that a shareholder cannot make or receive a settlement payment, as that term is defined in section 741(8), with respect to a "routine" purchase of securities. See Appellant's Opening Brief at 14 (referring to "obligations of an insolvent customer or broker to make settlement payments"); id. at 16 (citing reference in legislative history to "settlement payment owed to a customer").6 Instead, Kaiser argues that the term "settlement payment" when applied to shareholders only applies to such routine securities transactions, not an extraordinary securities transaction like the leveraged buy out. For example, it notes that definitions used in Schwab to support the broad notion that "settlement" is "the completion of a securities transaction," 913 F.2d at 849, in fact refer to securities trades.7 Similarly, Kaiser asserts that the scope of section 546(e) does not extend beyond the "securities contract." 11 U.S.C. § 741(7).
 
 
 22
 In Schwab, we recognized that "Kaiser's position that section 546(e) was only intended to insulate from avoidance routine securities transactions is not without merit." 913 F.2d at 850. However, we continue to note that while Congress might have chosen otherwise, neither § 546(e) or § 741(8) is on its face limited to "securities contracts," as defined by the Code, or to "trades," as defined by Kaiser. Compare 11 U.S.C. § 546(e) with 11 U.S.C. § 362(b)(6) (a companion provision to § 546(e) that names the same entities and explicitly refers to margin and settlement payments "arising out of commodity contracts, forward contracts, or securities contracts" (emphasis added)). Cf. Gozlon-Peretz v. United States, --- U.S. ----, 111 S.Ct. 840, 846-47, 112 L.Ed.2d 919 (1991) ("where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion" (quoting Russello v. United States, 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983))).8
 
 
 23
 Given the wide scope and variety of securities transactions, we will not interpret the term "settlement payment" so narrowly as to exclude the exchange of stock for consideration in an LBO. As the appellees and the SEC have urged, there is no reason to narrow the plain concept of "settlement" to a single type of securities transaction. The Code has been expanded to explicitly cover five different types of financial transactions, all of which, with the exception of swap agreements, involve "settlement payments" of one form or another.9 In fact, the definition of "settlement payment" found in § 741(8) also applies to payments made in connection with a repurchase agreement, which is not a "trade" entered into on an exchange, and which involves a completely different settlement process. See Bevill, Bresler & Schulman Asset Management Corp. v. Spencer Sav. & Loan Ass'n, 878 F.2d 742, 752 (3d Cir.1989).
 
 
 24
 While the leveraged buy out may not be a "routine" securities trade, at least as viewed by Kaiser, we cannot deny what in substance took place here. The LBO was a securities transaction, varying only in form from the various other ways in which a shareholder's equity interest can be sold. The former Kaiser Steel shareholders effectively sold their equity interests to the new investors in exchange for money and a continuing stake in the new entity as preferred shareholders. In settlement of that transaction, the Kaiser Steel shareholders tendered their shares and received payment. These payments were "settlement payments." Schwab, 913 F.2d at 850.
 
 
 25
 Consequently, those shareholders who tendered their shares one day after the LBO and received the LBO consideration are treated just the same under the Code as shareholders who sold their shares in the market one day prior to the LBO and received a settlement payment reflecting the market value of the LBO consideration. Neither type of investor will be forced to disgorge the payments several years later.10
 
 
 26
 B. "By or To."
 
 
 27
 Finally, Kaiser argues that even if the payments were settlement payments, § 546(e) does not protect a settlement payment "by" a stockbroker, financial institution, or clearing agency, unless that payment is to another participant in the clearance and settlement system and not to an equity security holder. We disagree.
 
 
 28
 On its face the statute is clear. The statute exempts payments made "by or to " a stockbroker, financial institution, or clearing agency. Again, unless there is some reason to believe the clear application is absurd or otherwise unreasonable, we can leave our inquiry at that.
 
 
 29
 Kaiser apparently does not deny that these transfers were in fact made to each beneficial shareholder, either by the shareholder's stockbroker, a clearing agency, or a financial institution. Instead, relying on the legislative history and the exclusion of the word "equity security holder" among the parties listed in section 546(e), it urges that we must interpret the "by or to" language in a way that only protects payments received by brokers (except those trading on their own account), financial institutions and clearing agencies, or other participants in the clearance and settlement process. Whether or not this formulation accurately reflects Congress' "intent", and there is good reason to believe that it does not,11 Kaiser has given us no reason to replace the unambiguous language of the provision with clues garnered from the legislative history. See Miller v. Commissioner, 836 F.2d 1274, 1283 (10th Cir.1988) ("When there is a conflict between portions of legislative history and the words of a statute, the words of the statute represent the constitutionally approved method of communication, and it would require 'unequivocal evidence' of legislative purpose as reflected in the legislative history to override the ordinary meaning of the statute."). Certainly, we cannot say that the clear application is absurd, given the fact that disruption in the securities industry--an inevitable result if leveraged buy outs can freely be unwound years after they occurred--is also a harm the statute was designed to avoid. See Schwab, 913 F.2d at 848-49. Accordingly, we must reject Kaiser's argument.
 
 
 30
 While we acknowledge that our holding in this case is broad in its application, we are not convinced it leaves the trustee remediless by way of a suit for damages, or some similar device, against specific individuals or institutions for unlawful acts.
 
 
 31
 Accordingly, for the reasons given above, the judgment of the district court is AFFIRMED.
 
 
 
 1
 The SEC filed a brief in this case and participated in oral argument. As a statutory party in corporate reorganization proceedings, the Commission acts as a special advisor to the courts. See 11 U.S.C. § 1109(a). Although precluded from initiating an appeal when appearing in this capacity, the Commission may participate in an appeal taken by others. Kaiser Steel Corp. v. Charles Schwab & Co., Inc., 913 F.2d 846, 850 (10th Cir.1990) (citation omitted)
 
 
 2
 The court did not dismiss the claims against a group known as the Jacob's Defendants
 
 
 3
 The definition of "settlement payment" found in section 101(39), also referred to in section 546(e), applies only to forward contracts
 
 
 4
 Under this system there are also at least two corresponding sets of guarantees. The brokers guarantee that they will perform even if their customers fail to perform, and the clearing agency guarantees to perform, even if individual clearing members fail to perform. Prior to settlement, these guarantees subject the brokers and the clearing agency to a potential risk of loss, should a selling party be forced to cover the obligations of a defaulting customer or clearing member in a rising market (i.e., buy securities that cost more than the party will receive), or should a buying party be forced to buy securities in a falling market (i.e., pay more for securities than their present market value). To reduce this risk, in a fluctuating market, the clearing agency may demand certain types of "margin payments" from its clearing members, and a broker may be required to demand similar types of payments from its customers. These payments, like settlement payments, are protected under § 546(e)
 
 
 5
 That this is a proper use in the industry of the term "settlement payment" may also be verified by several references in SEC literature. See, e.g., Exchange Act Release No. 27,505 (Dec. 5, 1989) ("Funds-only settlement payments are made to and from GSCC clearing banks by members over the cash Fed-wire."); Exchange Act Release No. 23,488 (July 31, 1986); Exchange Act Release No. 22,778 (Jan. 8, 1986) (discussion of clearance and settlement system in which clearing agency generates settlement figures, but instead of guaranteeing settlement payment, participants are required to make the payments between themselves); Exchange Act Release No. 22, 599 (Nov. 6, 1985). Cf. 11 U.S.C. § 741(7) (the definition of "securities contract" includes "the guarantee of any settlement of cash or securities by or to a securities clearing agency"); 11 U.S.C. § 362(b)(6) (refers to cash, securities, or other property held by or due from a stockbroker, financial institution, or securities clearing agency to "settle" securities contracts)
 Apart from protecting margin payments to brokers, the original Code provision as well protected only settlement payments by or to the clearing agency. Actually, on its face the 1978 predecessor of 546(e) prevented the trustee from avoiding "settlement payment[s] made by a clearing organization." 11 U.S.C. § 764(c) (1978). Apparently through "inadvertence," the provision failed to note that settlement payments to a clearing agency were also protected, so a colloquy was entered into the legislative history to clarify this. See 124 Cong.Rec. 17,433 (Oct. 6, 1978). In fact, the "by or to" language in the present Code provision was designed in part to officially implement this clarification. 1981 Hearings at 205, 232.
 
 
 6
 While Kaiser does not argue in the abstract that "settlement payments" may not be made to a customer, it does argue that section 546(e) does not protect settlement payments to customers
 
 
 7
 See Appellant's Opening Brief at 8-9. For example, it notes that A. Pessin & J. Ross, Words of Wall Street: 2000 Investment Terms Defined, cited restrictively to define settlement as "the completion of a securities transaction," more fully defines the term as an "Industry term for the completion of a securities transaction (i.e., a buyer pays for and a seller delivers the security purchased to the buyer.)" "Transaction" is defined in that source as follows: "Used synonymously for a trade (i.e., a completed agreement between a buyer and a seller)." Id. at 271
 
 
 8
 Congress has also shown itself capable of restricting the counterparts of § 546(e) to a particular type of transaction. See 11 U.S.C. § 546(f) (refers to settlement payments made by or to a repo participant, "in connection with a repurchase agreement ") (emphasis added) and 11 U.S.C. § 546(g) (refers to transfers made by or to a swap participant, "in connection with a swap agreement ") (emphasis added)
 
 
 9
 These transactions are the "securities contract," see 11 U.S.C. § 741(7), the "repurchase agreement," see 11 U.S.C. § 101(47), the "commodity contract," see 11 U.S.C. § 761(4), the "forward contract," see 11 U.S.C. § 101(25), and the "swap agreement," see 11 U.S.C. § 101(55). With regard to the securities contract and the repurchase agreement, the definition of "settlement payment" is found in section 741(8), which refers to types of settlement payments commonly used in the "securities trade." See 11 U.S.C. § 741(8). For the forward contract, the definition of "settlement payment" is found in section 101(39), which refers to types of settlement payments commonly used in the "forward contract trade." See 11 U.S.C. § 101(39). For commodity contracts, various types of settlement payments are included within the definition of "margin payment" found in section 761(15), including "daily settlement payments" and "final settlement payments made as adjustments to settlement prices." See 11 U.S.C. § 761(15)
 
 
 10
 For the public customer, this symmetry of treatment is justified not only by application of the plain notion of "settlement." As well, it is justified by Congress' policy interests in promoting finality and "in promoting speed and certainty in resolving complex financial transactions." H.Rep. No. 484, 101st Cong., 2d Sess. 2 (1990), reprinted in 1990 U.S.C.C.A.N. 223, 224. See also Schwab, 913 F.2d at 848 ("Such an interpretation 'is consistent with the legislative intent behind § 546 to protect the nation's financial markets from the instability caused by the reversal of settled securities transactions.' " (citation omitted))
 For the broker trading on its own account, our holding is consistent with even the strictest notion of "settlement payment" (i.e., a notion tied to the clearance and settlement system). This is true particularly to the extent a broker's settlement obligations to a clearing agency or participant were calculated with regard to the payments of LBO consideration. Cf. Brief of Appellee at 12, Kaiser Steel Resources, Inc. v. Charles Schwab & Co., Inc. (referring to parties' stipulation that Schwab's settlement obligations to clearing agency (NSCC) were calculated by reference to "daily cash settlement" figures generated by DTC). Further, as the SEC has emphasized, this holding is supported by Congress' policy of promoting the health of the clearance and settlement system, which by all accounts is one of the fundamental aims of the 546(e) exemption. See Schwab, 913 F.2d at 848-49.
 For a contrary view, see Weibolt Stores, Inc. v. Schottenstein, 131 B.R. 655, 663-665 (N.D.Ill.1991); Neil M. Garfinkel, Note, No Way Out: Section 546(e) Is No Escape for the Public Shareholder of a Failed LBO, 1991 Colum.Bus.L.Rev. 51 (1991).
 
 
 11
 It is difficult to imagine, for instance, how Congress could recognize that a settlement payment may be made by a stockbroker to its customer (whether that customer is bankrupt or not), see Appellant's Opening Brief at 16 (citing reference in legislative history to "settlement payment owed to a customer"), and not realize that section 546(e), which on its face protects settlement payments by a stockbroker, is likely to be read by a court to protect settlement payments by a stockbroker to its customer
 Further, Kaiser's claim that § 546(e) does not protect brokers trading on their own account is clearly wrong. Kaiser argues that such brokers are "equity security holders" and not "stockbrokers." It notes as well that "stockbrokers" must have "customers." 11 U.S.C. § 101(54)(A). However, the definition of "stockbroker" was intentionally fashioned to include dealers who "effect[ ] transactions in securities ... with members of the general public, from or for such person's own account," 11 U.S.C. § 101(54)(B) (emphasis added), and "customer," as used in the Code is a term of art, broadly defined in § 741(2) to "include anybody that interacts with the [broker] in a capacity that concerns securities transactions." S.Rep. No. 989, 95th Cong., 2d Sess. 100 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5886. The customer requirement was apparently designed only to prevent employees of brokers from claiming the benefits of certain Code provisions. See S.Rep. No. 989, 95th Cong., 2d Sess. 27 (1978), reprinted in 1978 U.S.C.C.A.N. 5813.