# SHELL OIL CO. *v.* IOWA DEPARTMENT OF REVENUE

No. 87–984.   Argued October 4, 1988—Decided November 8, 1988

*Kenneth S. Geller* argued the cause for appellant. With him on the briefs were *Mark I. Levy, Steven C. Stryker, William D. Peltz,* and *James W. Hall.*

*Harry M. Griger,* Special Assistant Attorney General of Iowa, argued the cause for appellee. With him on the brief was *Thomas J. Miller,* Attorney General.

*Deputy Solicitor General Wallace* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Fried, Assistant Attorney General Rose, Richard J. Lazarus,* and *Richard Farber.**

---

*Briefs of *amici curiae* urging affirmance were filed for the State of New Jersey et al. by *Cary Edwards,* Attorney General of New Jersey, *James J. Ciancia,* Assistant Attorney General, and *Mary R. Hamill* and *John P. Miscione,* Deputy Attorneys General, and by the Attorneys General for their respective States as follows: *Robert K. Corbin* of Arizona, *John Steven Clark* of Arkansas, *Duane Woodard* of Colorado, *James T. Jones* of Idaho, *J. Joseph Curran, Jr.,* of Maryland, *Hubert H. Humphrey III* of Minnesota, *William L. Webster* of Missouri, *Mike Greely* of Montana, *Robert Abrams* of New York, *Nicholas J. Spaeth* of North Dakota, *Dave Frohnmayer* of Oregon, and *T. Travis Medlock* of South Carolina; for the Florida Department of Revenue by *Robert A. Butterworth,* Attorney General of Florida, *Joseph C. Mellichamp III,* Assistant Attorney General, and *Sharon A. Zahner;* and for the Multistate Tax Commission by *Eugene F. Corrigan.*

*John K. Van de Kamp,* Attorney General of California, *Robert F. Tyler,* Supervising Deputy Attorney General, and *Robert D. Milam,* Deputy Attorney General, filed a brief for the State of California as *amicus curiae.*

JUSTICE MARSHALL delivered the opinion of the Court.

In this appeal, we must decide whether the Outer Continental Shelf Lands Act (OCSLA), 67 Stat. 462, 43 U. S. C. § 1331 *et seq.* (1982 ed. and Supp. III), prevents Iowa from including income earned from the sale of oil and gas extracted from the Outer Continental Shelf (OCS) in the apportionment formula it uses to calculate in-state taxable income. We hold that it does not.

## I

Shell Oil Company (Shell) is a unitary business,[1] incorporated in Delaware. Its activities include producing, transporting, and marketing oil and gas and the products that are made from them. Shell extracts oil and gas not only within various States but also on the OCS, which is defined by the OCSLA as all those submerged lands three or more geographical miles from the United States coastline.[2] Between 1977 and 1980, the tax years at issue in this case, a portion of Shell's gross revenues was derived from the sale of oil and gas extracted from the OCS and the sale of products made from OCS oil and gas.

During the years at issue, Shell sold all of its OCS natural gas directly at the wellhead platform located above the OCS. Nearly all of its OCS crude oil, by contrast, was transferred via pipelines to the continental United States, where Shell either sold it to third parties or refined it. The refining process typically involves the commingling of OCS crude oil with crude oil purchased or drawn by Shell from other places.

---

[1] The Iowa Code defines a unitary business as one which is "carried on partly within and partly without a state where the portion of the business carried on within the state depends on or contributes to the business outside the state." Iowa Code § 422.32(5) (1987).

[2] The OCS includes "all submerged lands lying seaward and outside of the area of lands beneath navigable waters as defined in section 1301 of this title." 43 U. S. C. § 1331. "[L]ands beneath navigable waters" include all submerged lands within three geographical miles of the coastline of the United States. § 1301.

Thus, the original source of oil in any Shell-refined product is indeterminable.

Shell's principal business in the State of Iowa during the years at issue was the sale of oil and chemical products which it had manufactured and refined outside of Iowa. These products included OCS crude oil that had been commingled with non-OCS crude oil.

Iowa imposes an income tax on corporations doing business in Iowa. Iowa Code § 422.33(2) (1987). For a unitary business like Shell, that income tax is determined by a single-factor apportionment formula based on sales. Under that formula, Iowa taxes the share of a corporation's overall net income that is "reasonably attributable to the trade or business within the state." *Ibid.*[3] We have previously upheld Iowa's sales-based apportionment formula against

---

[3] Iowa Code § 422.33(2) (1987) provides, in pertinent part, as follows:

"(2) If the trade or business of the corporation is carried on entirely within the state, the tax shall be imposed on the entire net income, but if the trade or business is carried on partly within and partly without the state, the tax shall be imposed only on the portion of the net income reasonably attributable to the trade or business within the state, said net income attributable to the state to be determined as follows:

"(b)(4) Where income is derived from the manufacture or sale of tangible personal property, the part thereof attributable to business within the state shall be in that proportion which the gross sales made within the state bear to the total gross sales."

Iowa defines income by reference to federal taxable income which it then adjusts under Iowa law. Iowa Code §§ 422.32(6) and (11) (1987).

Described as a formula, the method for calculating the portion of Shell's total income which is subject to Iowa income tax is as follows:

$$\left( \frac{\text{Iowa Gross Sales}}{\text{Total Gross Sales}} \right) \times \left( \begin{array}{l} \text{Federal Taxable} \\ \text{Income Adjusted} \\ \text{per Iowa Law} \end{array} \right) = \text{Iowa Income.}$$

Due Process and Commerce Clause challenges in *Moorman Manufacturing Co.* v. *Bair*, 437 U. S. 267 (1978).

Between 1977 and 1980, Shell filed Iowa tax returns in which it adjusted the Iowa formula to exclude a figure which it stated reflected "income earned" from the OCS.[4] The Iowa Department of Revenue audited Shell's returns and rejected this modification. Accordingly, the Iowa Department of Revenue found Shell's tax payment deficient. Shell challenged that determination, claiming at a hearing before the Iowa Department of Revenue that inclusion of OCS-derived income in the tax base of Iowa's apportionment formula violated the OCSLA. The hearing officer rejected that contention. Shell appealed to the Polk County District Court, which affirmed the administrative decision, No. AA952 (Oct. 3, 1986), App. to Juris. Statement 15a (Polk County opinion), and to the Iowa Supreme Court, which also affirmed. *Kelly-Springfield Tire Co.* v. *Iowa State Board of Tax Review*, 414 N. W. 2d 113 (1987).[5] Both courts concluded, based upon an examination of the text and history of the OCSLA, that the OCSLA did not pre-empt Iowa's apportionment formula. We noted probable jurisdiction, 484 U. S. 1058 (1988), and now affirm.

---

[4] Shell adjusted the Iowa formula, set out above, see n. 3, as follows:

$$\left( \frac{\text{Iowa Gross Sales}}{\text{Total Gross Sales minus OCS "sales"}} \right) \times \left( \text{Non-OCS Federal Taxable Income} \right) = \text{Iowa Income}.$$

The OCS "sales" which Shell sought to deduct from the denominator of the sales ratio included both actual sales at the wellhead, which occur only in the case of gas, and, "sales" of oil, which, measured by an internal Shell accounting technique, record transfers between Shell divisions. Shell also sought to deduct the income from such sales from the income multiplier.

[5] Shell's appeal before the Iowa Supreme Court was consolidated with a tax appeal by Kelly-Springfield Tire.

24

## II

We have previously held that Iowa's apportionment formula is permissible under the Commerce Clause. *Moorman Manufacturing Co.* v. *Bair, supra.* Shell's argument here is purely one of federal statutory pre-emption. It contends that, in passing the OCSLA, Congress intended to impose stricter requirements on a taxing State's apportionment formula than those imposed by the operation of the Commerce Clause alone. Shell points to the text and history of the OCSLA which it believes evince a clear congressional intent to preclude States from including in their apportionment formulas income arising from the sale of OCS oil and gas. In assessing this claim, we review first the text and then the history of the OCSLA.

Shell's argument is that the plain language of the OCSLA enacts an "absolute and categorical" prohibition on state taxation of income arising from sales of OCS gas and oil. Brief for Appellant 13. Shell relies specifically on subsections 1333(a)(2)(A) and (a)(3) which provide, in pertinent part, as follows:

> "(2)(A) To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations . . . , the civil and criminal laws of each adjacent State . . . are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf . . . . All of such applicable laws shall be administered and enforced by the appropriate officers and courts of the United States. *State taxation laws shall not apply to the outer Continental Shelf.*

"(3) The provisions of this section for adoption of State law as the law of the United States *shall never be interpreted as a basis for claiming any interest in* or jurisdiction on behalf of any State for any purpose over the seabed and subsoil of the outer Continental Shelf, *or the property and natural resources thereof or the revenues therefrom.*" 43 U. S. C. §§ 1333(a)(2)(A) and (a)(3) (emphasis added).

It is, of course, well settled that "when a federal statute unambiguously forbids the States to impose a particular kind of tax . . . , courts need not look beyond the plain language of the federal statute to determine whether a state statute that imposes such a tax is pre-empted." *Aloha Airlines, Inc.* v. *Director of Taxation of Hawaii*, 464 U. S. 7, 12 (1983). But the meaning of words depends on their context.[6] Shell reads the italicized language above without reference to the statutory context when it argues that these statutory words ban States from including income from OCS oil and gas in an apportionment formula.

We believe that § 1333(a)(2)(A), read in its entirety, supports a narrower interpretation. Subsection 1333(a)(2)(A) begins by clarifying which laws will apply to offshore activity on the OCS. It declares that the civil and criminal laws of the States adjacent to OCS sites will apply. Subsection 1333(a)(2)(A) goes on to create an exception to this general incorporation. It is highly significant to us that § 1333(a)(2)(A) refers specifically to *"adjacent* State[s]," 43 U. S. C. § 1333(a)(2)(A) (emphasis added). The subsequent reference in the subsection to "state taxation laws" can only be read in light of this antecedent reference to "adjacent State[s]." It is clearly included lest this federal incorpora-

---

[6] As Judge Learned Hand so eloquently noted: "Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used . . . ." *NLRB* v. *Federbush Co.*, 121 F. 2d 954, 957 (CA2 1941).

tion be deemed to incorporate as well the *tax codes* of adjacent States.

The ensuing subsection, 1333(a)(3), was similarly drafted to prevent tax claims by adjacent States. It states that the incorporation of state law "as the law of the United States" is never to be interpreted by the States whose law has been incorporated to give them jurisdiction over the property or revenues of the OCS.[7] Reading the statutory provisions in the context of the *entire* section in which they appear, we therefore believe that in enacting subsections 1333(a)(2)(A) and 1333(a)(3), Congress had the more limited purpose of prohibiting adjacent States from claiming that it followed from the incorporation of their civil and criminal law that their tax codes were also directly applicable to the OCS.

The background and legislative history of the OCSLA confirm this textual reading and refute Shell's view of broader pre-emption. The OCSLA grew out of a dispute, which first developed in the 1930's, between the adjacent States and the Federal Government over territorial jurisdiction and ownership of the OCS and, particularly, the right to lease the submerged lands for oil and gas exploration. S. Rep. No. 133, 83d Cong., 1st Sess., 21 (1953). The adjacent States claimed jurisdiction over the submerged lands and their rich oil, gas, and mineral deposits, *id.*, at 6, and some had even extended their territorial boundaries as far as the outer edge of the OCS. *Id.*, at 11. After this Court, in a series of opinions, ruled that the Federal Government, and not the adjacent States, had exclusive jurisdiction over the OCS, *United States* v. *Louisiana*, 339 U. S. 699, 705 (1950); *United States*

---

[7] There is, in any event, evidence that the Senate thought that § 1333(a)(2)(A) was intended to duplicate § 1333(a)(3)'s prohibition on adjacent state claims of interest in or jurisdiction over the OCS. The floor manager of the Senate bill, Senator Cordon, explained that the language of § 1333(a)(2)(A) stating that "[s]tate taxation laws shall not apply to the outer Continental Shelf" was requested by the House conferees "in a superabundance of caution." 99 Cong. Rec. 10471–10472 (1953). According to Senator Cordon, the language "adds nothing to and took nothing from the bill as it passed the Senate." *Ibid.*

v. *Texas*, 339 U. S. 707, 717–718 (1950); *United States* v. *California*, 332 U. S. 19, 38–39 (1947), Congress, in 1953, passed the OCSLA.

In passing the OCSLA, Congress intended to provide "for the orderly development of offshore resources." *United States* v. *Maine*, 420 U. S. 515, 527 (1975). Congress was concerned with defining territorial jurisdiction between the adjacent States and the Federal Government as to the submerged lands, particularly with reference to leasing oil and gas rights. The OCSLA states that "the subsoil and seabed of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control, and power of disposition . . . ." 43 U. S. C. § 1332. Thus, "[b]y passing the OCS Act, Congress 'emphatically implemented its view that the United States has paramount rights to the seabed beyond the three-mile limit . . . .'" *Maryland* v. *Louisiana*, 451 U. S. 725, 752–753, n. 26 (1981) (quoting *United States* v. *Maine, supra,* at 526).

Once the Court ruled that the OCS was subject to the exclusive jurisdiction and control of the Federal Government, Congress was faced with the problem of which civil and criminal laws should govern activity on the OCS sites. The Constitution and the laws of the United States were extended to cover the OCS. 43 U. S. C. § 1333(a)(2)(A). Congress recognized, however, that because of its interstitial nature, federal law would not provide a sufficiently detailed legal framework to govern life on "the miraculous structures which will rise from the sea bed of the [OCS]." Christopher, The Outer Continental Shelf Lands Act: Key to a New Frontier, 6 Stan. L. Rev. 23, 37 (1953).* The problem before Congress was to incorporate the civil and criminal laws of the adjacent

---

* Christopher noted that the "whole circle of legal problems" typically resolved under state law could arise on the OCS, because the large crews working on the great offshore structures would "die, leave wills, and pay taxes. They will fight, gamble, borrow money, and perhaps even kill. They will bargain over their working conditions and sometimes they will be injured on the job." 6 Stan. L. Rev., at 37.

States, and yet, at the same time, reflect the strong congres-sional decision against allowing the adjacent States a direct share in the revenues of the OCS, by making it clear that state taxation codes were not to be incorporated. *Id.*, at 37, 41.

In debates over the OCSLA, representatives of the adjacent States had argued that, despite exclusive federal jurisdiction over the OCS, their States should retain an interest in direct revenues from the OCS, and that they should be allowed the power to tax OCS production and activity extraterritorially. In particular, Senator Long of Louisiana argued that the adjacent States should have a share of OCS revenues since they would be providing services to OCS workers. S. Rep. No. 411, 83d Cong., 1st Sess., 67 (1953) (minority report of Sen. Long); see also 99 Cong. Rec. 7261 (1953) (remarks of Sen. Long).

Opponents of such adjacent-state extraterritorial taxation argued that extending the adjacent States' power to tax beyond their borders would be "unconstitutional," 99 Cong. Rec. 2506 (1953) (remarks of Rep. Celler); *id.*, at 2524 (remarks of Rep. Machrowicz); *id.*, at 2571–2572 (remarks of Rep. Keating), and that it would confer a windfall benefit upon the few adjacent States at the expense of the inland States. *Id.*, at 2523 (remarks of Rep. Rodino); *id.*, at 2524 (remarks of Rep. Machrowicz).

In the House, the Representatives of the adjacent States pressed for the inclusion of language in the OCSLA authorizing them to collect severance and production taxes. The House version of the bill, as reported out of Subcommittee No. 1 of the House Judiciary Committee, contained the present language prohibiting direct taxation by adjacent States. See 99 Cong. Rec. 2571 (1953) (remarks of Rep. Keating). The House Judiciary Committee amended the subsection to allow adjacent States to collect severance and production taxes. *Ibid.* See also, H. R. 4198, 83d Cong., 1st Sess. § 8(a) (1953). On the House floor, however, that provision was deleted and replaced by the prohibition on state taxation

which appears in 43 U. S. C. § 1333(a)(2)(A). 99 Cong. Rec. 2569, 2571–2573 (1953).

There is no reliable support in the legislative history of the OCSLA for Shell's view that state income taxes are pre-empted. During a long speech criticizing the OCSLA because it prevented the adjacent States from imposing severance and production taxes, Senator Long mentioned, in passing, that employers on the OCS would not be subject to the state corporate profits tax. See S. Rep. No. 411, *supra,* at 67; see also 99 Cong. Rec. 7261 (1953). Shell, however, is unable to point to any other reference in the legislative history to corporate income taxes beyond this one remark by a vocal opponent of the OCSLA. This Court does not usually accord much weight to the statements of a bill's opponents. "'[T]he fears and doubts of the opposition are no authoritative guide to the construction of legislation.'" *Gulf Offshore Co.* v. *Mobil Oil Corp.,* 453 U. S. 473, 483 (1981) (quoting *Schwegmann Bros.* v. *Calvert Distillers Corp.,* 341 U. S. 384, 394 (1951)). Moreover, Senator Long's remarks were apparently premised on the assumption that the private lessees on the OCS would not also engage in business activities within the taxing State's borders. See 99 Cong. Rec. 7261 (1953); S. Rep. No. 411, *supra,* at 67. Finally, it is entirely possible that Senator Long was referring to a corporate income tax which, unlike Iowa's, was not measured by an apportionment formula. See *Texas Co.* v. *Cooper,* 236 La. 380, 107 So. 2d 676 (1958) (Louisiana tax collector has statutory power to determine an oil company's income by separate accounting rather than statutory apportionment method). We therefore find that Shell's reliance on an isolated statement by Senator Long is misplaced.

In sum, the language, background, and history of the OCSLA leave no doubt that Congress was exclusively concerned with preventing the adjacent States from asserting, on the basis of territorial claims, jurisdiction to assess direct

30

taxes on the OCS.[9] We believe that Congress primarily intended to prohibit those direct taxes commonly imposed by States adjacent to offshore production sites: for example, severance and production taxes. See *Maryland* v. *Louisiana*, 451 U. S., at 753, n. 26 ("It is clear that a State has no valid interest in imposing a severance tax on federal OCS land").[10] This prohibition is a far cry from prohibiting a State from including income from OCS-derived oil and gas in a constitutionally permissible apportionment scheme.

Shell's argument hinges on the mistaken premise that including OCS-derived income in the preapportionment tax base is tantamount to the direct taxation of OCS production. But income that is included in the preapportionment tax base is not, by virtue of that inclusion, taxed by the State. Only the fraction of total income that the apportionment *formula* determines (by multiplying the income tax base by the apportionment fraction) to be attributable to Iowa's taxing jurisdiction is taxed by Iowa. As our Commerce Clause analysis of apportionment formulas has made clear, the inclusion of in-

---

[9] Shell's reliance on the fact that the OCS is an exclusive federal enclave is misplaced. Iowa is not attempting to tax property within the OCS. *White Mountain Apache Tribe* v. *Bracker*, 448 U. S. 136 (1980). Nor does any policy of the OCSLA prevent States from including OCS-derived income in a constitutionally permissible apportionment formula. *Ramah Navajo School Bd., Inc.* v. *Bureau of Revenue of New Mexico*, 458 U. S. 832 (1982).

[10] Although aimed specifically at the adjacent States, the prohibition against direct taxes obviously also applies to inland States, like Iowa. Before this Court's rulings and passage of the OCSLA, the adjacent States could conceivably have claimed the right to impose a severance or production tax based on oil and gas removed from the OCS, on the grounds that their territorial boundaries extended, or should be deemed to extend, far out into the ocean. Iowa, or any landlocked State, would have appeared foolish in making such a claim. After the passage of the OCSLA, both the adjacent and the landlocked States are precluded from imposing such taxes on OCS activities. See Polk County opinion, at 4. Likewise, both adjacent and landlocked States may include income from OCS-derived oil and gas in an otherwise constitutionally permissible apportionment formula.

come in the preapportioned tax base of a state apportionment formula does not amount to extraterritorial taxation. This Court has repeatedly emphasized that the function of an apportionment formula is to determine the portion of a unitary business' income that can be fairly attributed to in-state activities. *Exxon Corp.* v. *Wisconsin Dept. of Revenue*, 447 U. S. 207, 219 (1980); *Mobil Oil Corp.* v. *Commissioner of Taxes of Vermont*, 445 U. S. 425, 440 (1980). Thus, Shell's claim that Iowa is taxing income attributable to the OCS cannot be squared with its concession that Iowa's apportionment formula is consistent with the Commerce Clause.

A contrary result—forbidding the inclusion of income from OCS-derived oil and gas in Iowa's apportionment formula—would give oil companies doing business on the OCS a significant exemption from corporate income taxes in all States which measure corporate income with an apportionment formula. Congress has the power to confer such an exemption, of course, but we find no evidence that it intended to do so in the OCSLA.

Finally, we reject a secondary argument made by Shell. It argues that even if the OCSLA allows a State to include in its preapportioned tax base the sales of OCS crude oil which occur off the OCS, the taxing State may not include in that base income from the natural gas sales made at the OCS wellhead. On its face, the OCSLA makes no such distinction and, in general, it is irrelevant for the makeup of the apportionment formula's unitary tax base that third-party sales occur outside of the State. See *Exxon Corp., supra*, at 228–229. Actual sales on the OCS (as opposed to internal accounting sales) are not taxed directly by any State because they are not included in the numerator of the sales ratio. See n. 3, *supra*. From the inclusion of such sales in the apportionment formula's tax base, it does not follow that the dollar amount derived from the formula (which is a fraction of the unitary tax base) includes income not fairly attributable to Iowa.

## III

For the reasons set out above, we reject Shell's argument that Congress intended, when it passed the OCSLA, to prohibit the inclusion, in a constitutionally permissible apportionment formula, of income from OCS oil and gas. We hold that the OCSLA prevents any State, adjacent or inland, from asserting extraterritorial taxing jurisdiction over OCS lands but that the inclusion of income derived from the OCS in the unitary tax base of a constitutionally permissible apportionment formula does not amount to extraterritorial taxation by the taxing State. Accordingly, the judgment of the Iowa Supreme Court is hereby affirmed.

*It is so ordered.*