JOHN R. GIBSON, Circuit Judge.
Whether there should be motorized portages in the Boundary Waters Canoe Area Wilderness is the issue before us in this case. The district court refused to enjoin the motorized portages, and the Friends of Boundary Waters Wilderness and seven other groups[1] appeal. The central issue in the appeal boils down to the interpretation of the word “feasible” contained in Section 4(g) in the Boundary Waters Canoe Area Wilderness Act, Pub.L. No. 95-495, 92 Stat. *1485 1649 (1978). The district court upheld the Chief of the United States Forest Service’s decision allowing the motorized transporta- ■ tion of boats across the portages because no feasible alternative existed, 770 F.Supp. 1385. We are convinced the district court erred in its interpretation of the statute, particularly, the word “feasible,” and,we reverse.
The Boundary Waters Canoe Area Wilderness, in northeastern Minnesota, consists of some 1,075,500 acres of streams, lakes, and forests.[2] This case involves three portages in the Boundary Waters Canoe Area Wilderness: Prairie Portage, Four Mile Portage, and Trout Lake Portage. For some time, trucks have been used to carry boats across the portages. The Boundary Waters Canoe Wilderness Area Act, however, limits the continuation of this practice. Section 4(g) of the Act provides:
Nothing in this Act shall be deemed to require the termination of the existing operation of motor vehicles to assist in the transport of boats across the [Prairie Portage, Four Mile Portage, and Trout Lake Portage] during the period ending January 1, 1984. Following said date, unless the Secretary determines that there is no feasible nonmotorized means of transporting boats across the portages to reach the lakes previously served by the portages listed above, he shall terminate all such motorized use of each portage listed above.
The Secretary did not close the motorized portages in 1984. In 1986, the local Forest Service staff completed a Land Resource Management Plan for the Superior National Forest (the Boundary Waters Canoe Area lies wholly within the Superior National Forest). See 16 U.S.C. § 1604 (1988). The Plan authorized the continued motorized operation of the Prairie, Trout Lake, and Four Mile portages. The Plan concluded that these three portages should remain open because it was not feasible to use nonmotorized portage wheels to cross the portages. The Forest Service based this conclusion on a 1981 test m which three men unsuccessfully attempted to cross Prairie Portage using portage wheels.
The Friends administratively appealed the decision to continue to allow motorized portages. The Friends submitted a videotape and pictures showing three men traversing all three of the portages at issue, using portage wheels.
On March 10, 1989, the Chief of the Forest Service issued his decision on the administrative appeal. He observed that the Regional Forester’s 1981 study determined only that it was not feasible to use nonmotorized means to cross the Prairie Portage, and that no finding was made about the Four Mile or Trout Lake portages. The Chief concluded that “feasible” means “possible,” not “ideal” or “most practical.” The Chief directed the closing of the Four Mile and Trout Lake portages and ordered a study to test the feasibility of nonmotorized portaging for the Four Mile, Trout, and Prairie portages. The Chief observed that “[i]f a determination is made that it is feasible to use nonmotorized means to cross a portage, that portage must be closed.”
Six days later, however, the Chief issued a memorandum delaying the closure of the portages pending the feasibility study. The Friends claim that this change of mind was due' to a telephone call from Representative Jim Oberstar. The Chief admitted that Oberstar telephoned and informed him that his constituents were unhappy with the Forest Service’s decision, but claims that Oberstar did not ask him to change his ultimate decision on the issue — only to discuss his concerns with the interested parties. . .
In July and September 1989, the Forest Service conducted a feasibility study considering nonmotorized portaging. The Forest Service organized one; two, and three person teams of various ages and genders, using fishing boats with equipment loads of different weights. The field testers suc *1486 cessfully completed twenty-six out of thirty-four attempts, and most all of the three-person teams successfully completed the portages.
After considering the test results, the Chief determined that although portaging by nonmotorized means “[could] be done ... the task [was] not feasible.” ■ The Chief concluded that “the risk to health and safety of portagers should be taken into account in determining ‘feasibility.’ ” Relying on a study performed by three physiologists who concluded that it was physically dangerous for persons to attempt nonmo-torized portages, the Chief concluded that it was not “feasible” to attempt nonmotor-ized portages. Accordingly, the Chief ruled that all three motorized portages should remain open indefinitely. The district court affirmed the Chief’s decision, and this appeal followed.
I.
The Friends argue that the Chief’s decision leaving open the three motorized portages constitutes agency action “not in accordance with law.” 5 U.S.C. § 706(2)(A) (1988). They contend that the Chief’s decision violates the Boundary Waters Canoe Area Wilderness Act and the Wilderness Act, 16 U.S.C. §§ 1131-1186 (1988). They argue that as a matter of law, “feasible” me.ans “possible” and, therefore, the district court erred in failing to enjoin this violation of law.
The Supreme Court set forth our standard for reviewing agency action in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). We must first determine “whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give, effect to the unambiguously expressed intent of Congress.” Id. at 842-43, 104 S.Ct. at 2781. If the statute is silent or ambiguous, we-may-only review the agency’s action to determine whether that action “is based on a permissible construction of the statute.” Id. at 843, 104 S.Ct. at 2782. This court recently set forth the inquiry required by Chevron, in Emerson v. Steffen, 959 F.2d 119, 121 (8th Cir.1992).
Both parties suggest that the statute is unambiguous, and that the intent of Congress was clear. On the one hand, the Friends say that Congress intended “feasible” to mean “possible,” and the Chief violated Congress’ express intent by closing the motorized portages in light of the test results. The Chief and intervenors[3] respond that Congress intended that “feasible” meant “reasonable,” “practicable” or “likely,” and that the Chief, therefore, complied with the expressed intent of Congress in continuing to allow motorized portaging. Their fall-back position is that to the extent that the statute is ambiguous the Chief’s decision is based on a “permissible construction” of the Act, which is not arbitrary, capricious, or contrary to law, and therefore, must be upheld. 5 U.S.C. § 706(2)(A).
The Friends say that the Boundary Waters Canoe Area Wilderness Act, legislative history of the Act, Supreme Court precedent, and agency precedent conclusively establish that “feasible” means “physically possible.” For support, the Friends direct us to the Supreme Court’s decision in Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). In that case, the Supreme Court considered language contained in the Department of Transportation Act and Federal-Aid Highway Act which directed the Secretary not to “ ‘approve any program or project’ [which] requires the use of any public parkland ‘unless (1) there is no feasible and prudent alternative to the use of such land____’” Id. at 411, 91 S.Ct. at 821 (citations omitted). The Supreme Court observed “the requirement that there be no ‘feasible’ alternative route admits of little administrative discretion. For this exemption to apply the Secretary must find that as a matter of sound engineering it would not be feasible to build the *1487 highway along any other route.” Id. (footnote omitted).
The Chief and intervenors contend that “feasible” does not mean “physically possible,” and that Citizens to Preserve Over-ton Park, is not on point. Pointing to Webster’s Third New International Dictionary, 831 (3d ed.1967), they argue that feasible means “reasonably possible” or “practicable,” and that it is not “reasonably possible” or “practicable” to push a 16 foot, 25 horsepower boat and gear across the portages.
In considering the definition of “feasible,” we observe the purposes behind the Boundary Waters Canoe Area Wilderness and the Wilderness Acts. The Boundary Waters Canoe Area Wilderness Act includes as its purposes that of preventing: “further road and commercial development and restoring] natural conditions to existing temporary roads in the wilderness.” BWCAWA § 2(5). Although some motorboats are allowed on the lakes in issue, it is evident that congressional intent was to discourage motorized uses.
The Wilderness Act defines “wilderness”:
A wilderness, in contrast with those areas where man and his own works dominate the landscape, is hereby recognized as an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain. An area of wilderness is further defined to mean in this chapter an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man’s work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.
16 U.S.C. § 1131(c).
Prohibiting motorized portages, unless it is not “physically possible” to do so, is entirely consistent with the purposes announced in these Acts, and we are persuaded that the Chief’s definition of “feasible” was overly restrictive and contrary to clear congressional intent and the plain meaning of the word “feasible”. Chevron, 467 U.S. at 843, n. 9, 104. S.Ct. at 2782, n. 9 (“The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.”).
In addition to the definition of feasible set forth in Citizens to Preserve Overton Park, the Supreme Court defined “feasible” in American Textile Manufacturers Institute, Inc., v. Donovan, 452 U.S. 490, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981). In Donovan, the Supreme Court addressed the definition of “feasible” in Section 6(b)(5) of the Occupational Safety and Health Act, 29 U.S.C. § 655(b)(5) (1982). 452 U.S. at 508, 101 S.Ct. at 2490. The Court rejected the argument that a determination of “feasibility” required a cost-benefit analysis, and concluded that feasible meant “ ‘capable of being done, executed, or effected.’ ” Id. at 508-09, 101 S.Ct. at 2490 (quoting Webster’s Third New International Dictionary of the English Language 831 (1976)). Accord Asarco, Inc. v. Occupational Safety & Health Admin., 746 F.2d 483, 495-96 (9th Cir.1984).
We think it evident that. “Congress has directly spoken to the precise question” at issue. Chevron, 467 U.S. at 842, 104 S.Ct. at 2781. Section 4(g) requires termination of motorized use of the portages unless the Secretary determines that there is no feasible motorized means of transporting boats across the portages.. The feasibility test is simply an exception to a clearly expressed mandate. As discussed above, the. Supreme Court has considered the definition of the word “feasible” on two occasions. The addition of the term “sound engineering,” incorporated in Citizens to Preserve Overton Park does not redefine “feasible” *1488 to include “reasonably possible.” Indeed, the word “prudent” in the statute in Citizens to Preserve Overton Park, 401 U.S. at 411, 91 S.Ct. at 821, gave the agency substantially more leeway than the Forest Service had under section 4(g). Nevertheless, the Supreme Court concluded in that case that the agency had “little administrative discretion.” Id. Thus, in light of the test results, the Forest. Service had even less administrative discretion than the agency did in Citizens to Preserve Overton Park. The Chiefs decision, as effectuated by the district court’s ruling, as well as the dissent, reads into the statute an ambiguity which does not exist. In applying the clearly expressed intent of Congress, we can only conclude that “feasible” means “capable of being done” or “physically possible,” and as a matter of law, the Chief erred in ordering that the portages remain open.
Because we conclude that the statute is clear, we need not concern ourselves with the Act’s legislative history. We note, however, that the Act’s legislative history supports the Friends’ interpretation of the word feasible. The legislative history reveals a long-standing dispute between motorized and non-motorized uses in the Boundary Waters Canoe Wilderness Area. House Bill H.R. 12250 would have terminated all motorized portages. 124 Cong. Rec. S17,890 (daily ed. Oct. 9, 1978). During congressional deliberations, Senate Subcommittee Chair James Abourezk directed the opposing parties to compromise on several key issues, including portages. Id. at S17,889 (Statement of Sen. Wendell Anderson). The parties met and negotiated a compromise known as the “Dayton-Walls” compromise. Id. This compromise, instead of banning all portages as set forth in the House Bill, permitted two mechanized portages to exist indefinitely, BWCWA § 4(d), and proposed the “feasible means” test for the other three portages in issue. 124 Cong.Rec. S17,889 (daily, ed. Oct. 9, 1978). Representative Phillip Burton, manager of the House Conference Committee explained:
The final bill requires that the Secretary is to terminate all motorized use of the Prairie Portage from Sucker Lake to Basswood Lake, the Fourmile Portage from Fall Lake to Basswood Lake, the Trout Lake Portage from Lake Vermillion to Trout Lake on January 1, 1984, unless “no feasible nonmotorized means of transporting boats” between the lakes previously served by these portages is available.
I understand that feasible methods of transporting such boats in fact are already in use in the BWCA. I understand that during the compromise discussions it was agreed that “feasible” meant a method involving, two able-bodied resort guests and one able-bodied guide.
The compromise agreement simply requires that there be a feasible nonmotor-ized method of moving boats with motors no larger than 25 horsepower between the lakes in question, using three able-bodied adults. It does not require that the portage routes be the same ones now traversed by trucks.
For example, the Fourmile Portage truck trail from Fall Lake to Basswood Lake could be replaced by portaging through Newton Lake to Pipestone Bay of Basswood, and then from Pipestone Bay to Back Bay to reach the specific areas now served by the Fourmile Portage. Such a route already exists, and the portages involved are suitable for nonmotorized transport of such boats.
In fact, the Forest Service has allowed only nonmotorized transport of boats from Fall Lake to Basswood via the Newton Lake-Pipestone Bay route for several years now. The method often used for larger boats is to strap .or otherwise attach a carriage with bicycle wheels beneath one end of the boat, and then simply wheel the boat across the portage — like a wheelbarrow — with motor and fishing gear, gas cans, et cetera inside the boat. This method is feasible and proven, and I would expect that the Secretary will terminate motorized use of these portages and permit that method to be used.
Some people have suggested using rollers or a hand-operated tram-on rails, *1489 but those methods require permanent structures and mechanical equipment within the wilderness. Such developments are inappropriate. Following ter-’ mination of motorized used in 1984, I expect the Secretary to obliterate any unused truck trails, remove any unused docks, and otherwise eliminate as nearly as possible any evidence of man’s works.
124 Cong.Rec. H13,438 (daily ed. Oct. 14, 1978).
The Chief argues that Representative Burton’s statement is of no help because the statute itself is unambiguous, and the most authoritative source for determining congressional intent lies in the Committee Report. The Chief says that Burton’s statement is at odds with the Committee Report and, therefore, cannot be given any weight. Shell Oil Co. v. Iowa Dep’t of Revenue, 488 U.S. 19, 29, 109 S.Ct. 278, 283-84, 102 L.Ed.2d 186 (1988). The Chief cites a statement in the Committee Report which explains that a compromise was reached to “afford increased protection of the area’s wilderness character while allowing the continuation of the most heavily used and long established motorized uses.” S.Rep. No. 95-1327, 95th Cong., 2d Sess. 295-96 (1978). The Chief and the interve-nors suggest that the Friends’ true goal is to do away with outboard motors on Basswood and Trout Lakes despite Congress’ express authorization allowing motorboats on these lakes. They point out that prohibiting motorized portages will prevent many people, particularly older people, from enjoying the area.
Although we need not consider Burton’s statement as dispositive, we note that his statement is consistent with our interpretation of “feasible.” See Brock v. Pierce County, 476 U.S. 253, 263, 106 S.Ct. 1834, 1840, 90 L.Ed.2d 248 (1986). When the entire Committee Report is read, it is obvious that the passage the intervenors point to concerns snowmobile use, and has absolutely nothing to do with motorized portages. We think the compromise, permitting motorized uses on two of the portages and incorporating the feasibility test for the other three portages, reflects a clear congressional intent to ban motorized portages unless it was physically impossible to transport boats to lakes served by the portages.
We reverse the district court order.

. Sierra Club; the Wilderness Society; Defenders of Wildlife; Wilderness Watch; Wilderness Inquiry; Minnesota Public Interest' Research Group; and Izaak Walton League of America, Inc.

. We described this area in Minnesota Public Interest Research Group v. Butz, 498 F.2d 1314, 1316 (8th Cir.1974) (en banc).

. The intervenors include the City of Ely, Minnesota; Conservationists with Common Sense; Wilderness Outfitters, Inc.; and F.B. Hu-bachek, Jr.