958 A.2d 78

IN RE CARRY PERMIT OF JAMES L. ANDROS.

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
JAMES L. ANDROS, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted September 10, 2008—Decided October 14, 2008.

Before Judges STERN, PAYNE and LYONS.

*A. Harold Kokes,* attorney for appellant.

*Anne Milgram,* Attorney General, attorney for respondent (*Kathleen M. Gusler,* Deputy Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

STERN, P.J.A.D.

James Andros appeals from a judgment of March 23, 2007 that granted the State's application, under *N.J.S.A.* 2C:39–6L(6),[1] to revoke his permit to carry a firearm. Andros challenges both the denial of his motion to dismiss the application because of federal preemption under 18 *U.S.C.A.* § 926C enacted as part of the Law Enforcement Officers' Safety Act of 2004, which amended 18 *U.S.C.A.* § 921, *et seq.* relating to firearms,[2] and the determination on the merits. He contends that the revocation application is preempted; the Law Division "erred in finding that the State had

---

[1] We capitalize the L for ease of understanding in a typed opinion.

[2] The Act adopted sections 926B and 926C relating to carrying of concealed weapons "by qualified law enforcement officers" and "by qualified retired law enforcement officers," respectively.

presented 'good cause' for the revocation"; the trial court unduly limited his "request to cross-examine complaining witnesses"; there was a conflict of interest with respect to the complaining witnesses in one of the incidents; the trial court was "not an unbiased fact finder"; appellant's motion to dismiss based on the proofs should have been granted; the findings that his conduct "was not justified under the relevant sections of the criminal code was clear error"; and the aggregate of errors warrants reversal of the revocation or a remand for a new hearing.

Andros was an Atlantic City police officer from 1968 to 2003. He retired on February 1, 2003, in good standing. Prior to his retirement he applied for and obtained a permit to carry a handgun. He renewed his permit annually thereafter.

On July 4, 2004, a large crowd gathered at "the cove" section of Brigantine to watch the fireworks. Thereafter, a group of friends from Brigantine Elks Club, consisting of twenty to fifty people, remained at the scene. While they were relaxing and the children were playing along the water line in the dark, Andros drove his sport utility vehicle along the water line at a high rate of speed to avoid a line of traffic trying to exit. Andros' wife was in the vehicle. As Andros drove by the Elks group, Alan Dickinson shouted to him to slow down because he felt Andros' speed was dangerous to those in the area.

Andros immediately stopped and exited his vehicle. He walked over to Dickinson, and they exchanged words during which Dickinson told Andros to return to his vehicle. Bill Glose, who was part of Dickinson's group, also told Andros to get back in his vehicle, words were exchanged, and Andros was shoved, whereupon Andros punched Glose and "nipped" his face. Glose and Andros then started wrestling in the sand until they were pulled apart. When Andros got up, he went to his vehicle and removed a handgun. He then loudly announced, "I'm packin, stay back." After hearing Andros' warning, the group backed away from him, and the police were called.

Approximately fifteen to twenty minutes later, police officers Thomas Rehill and Matthew Fannon arrived on the scene. When the officers arrived the incident was already over. The officers were told by some of those present that the group had been upset with Andros for driving his vehicle in the crowded area, and were particularly concerned for the safety of the children that were present.

Both officers stated they knew Andros prior to the incident. They spoke with him and the others present. Andros acknowledged that he was carrying his handgun. The officers eventually asked Andros to leave the scene, feeling it could "calm down the situation."

A second incident occurred on the evening of February 8, 2005. Rasheem Rose and his cousin Daril Jackson were driving on the Black Horse Pike in Egg Harbor Township. Rose was traveling in the right lane when Andros, whose wife was also in the car, cut in front of Rose's vehicle, forcing Rose to brake and swerve to the right to avoid an impact. Rose beeped his horn at Andros and endeavored to pass him. As Rose was passing, Andros flashed his middle finger. Andros then moved behind Rose in the left lane, turned on his high beam lights, and began tailgating Rose. Rose attempted to signal for Andros to back off, but Andros bumped against the back of the Rose vehicle. Rose began to slow down, and this was followed by a second, harder tap to Rose's car.

Rose managed to get back into the right lane, as Jackson attempted to get the license plate number of Andros' car. Rose then pulled onto the shoulder hoping that Andros would drive by and they could get the number. However, Andros also went into the right lane, drove past them and then pulled over onto the shoulder of the road, stopping a short distance ahead. Having expected Andros to continue on, Rose was moving back into traffic when Andros pulled off onto the shoulder. Rose pulled off once more, stopping two car lengths ahead of Andros.

Rose exited his vehicle while dialing 9–1–1 on his cell phone, and walked toward the back of his vehicle to check for damage. As he

neared the back of his vehicle, Rose observed that Andros had a handgun in his right hand, causing him to drop his cell phone. Jackson also exited the car and observed Andros with the gun. Rose told Jackson to go back into the car, in order to retrieve his other cell phone and call 9–1–1.

As Jackson reached for the door, Andros pointed the handgun at Jackson and told both men he would kill them if they moved. Shortly thereafter, Andros allowed Rose to retrieve his dropped cell phone and call 9–1–1. He told Rose to advise the police he was a police captain and he was carrying his .38 caliber handgun.

When the Egg Harbor police officers arrived, they were carrying rifles, and ordered Andros, Rose and Jackson to put their hands up and get on the ground. As the officers moved forward, they observed a handgun on the pavement within five or six feet of Andros' right hand. Andros gave them his permit to carry the handgun. After the officers conducted their investigation, they returned Andros' gun to him and let him leave the scene.

Another less serious incident occurred on July 8, 2004, when the Egg Harbor Police Department received an early morning domestic violence call from the home of Andros' son, who was also a police officer. The call was made by Connie Wenchell, who lived with Andros' son. She had been locked out of the house and wished to retrieve some of her possessions. Wenchell informed the responding officers that Andros' son was intoxicated and his service weapon was in the house. Andros arrived at the scene after being called by Wenchell.

One of the officers testified that Andros became "part of the problem" and was "not cooperative," and prevented the officers from entering the home and talking with his son. As the event was not developed in detail, we discount its significance.

While Andros was still in active service on October 21, 2000, Mark Mulrooney was driving his truck on Brigantine Boulevard in Brigantine. Jess Muschler was in the vehicle and Andros was riding his bicycle on the street. Mulrooney moved into the left

lane to get around Andros, and Andros cut in front of him without the use of a hand signal. When Mulrooney beeped his horn at Andros, Andros turned around, gave him the middle finger, and then turned onto another street.

Mulrooney followed Andros, whereupon Andros got off his bike, slammed it to the ground in front of Mulrooney's vehicle, and started screaming at Mulrooney. Andros then approached Mulrooney's car door, opened the door, and proceeded to repeatedly strike Mulrooney in the face. In an effort to get away from Andros, Mulrooney hit the gas pedal and drove his vehicle onto someone's lawn. Mulrooney then exited his vehicle and sought assistance at a nearby house. The police were called and the officers who investigated the incident let everyone leave.[3]

Judge Robert Neustadter rendered a comprehensive written opinion on March 6, 2007. As a result of his credibility determinations and fact finding, the judge concluded:

> The entirety of the hearing leads this Court to conclude that, despite Registrant's thirty five years of exemplary service as a police officer, he has a temper and a hot-blooded nature. Therefore, his possession of a permit to carry a handgun creates a potentially dangerous situation that is "contrary to the public interest." The Court finds Registrant does not possess the appropriate restraint, judgment, and plain good common sense to avoid confrontations in situations in which [it] was possible and advisable to do so. This Court notes that as a retired law enforcement officer, Registrant was permitted to carry a weapon and authorized to use it in appropriate circumstances. The Court finds no fault with the statute authorizing retired law enforcement officers to carry concealed weapons and believes that statute is beneficial to the general public. However, Registrant's unnecessary and dangerous use of his weapon to intimidate others merely because he has the power to do so is unacceptable to this Court. To believe, as Registrant contends, that each of these incidents was an unavoidable result of his presence at the wrong place, at the wrong time, with the wrong people, requires this Court to accept an unlikely string of coincidences. While Registrant might well have been provoked during one or more of these incidents, or perhaps others not part of the record, no justification exists for his response as this Court heard it described by a multitude of witnesses. The law provides that a Superior Court Judge is authorized to revoke a retired law enforcement officer's permit to carry any weapon upon good cause shown by any

---

[3] No disciplinary action with respect to this matter was developed in the record. Andros complains that discipline relating to his shooting of a dog in 1981 was referred to during his cross-examination.

interested party. Good cause is not defined by case law, but Registrant's attorney provided a workable definition when he stated that good cause refers to "a very good and strong reason." This Court finds, after considering all the testimony and evidence produced by both the State and Registrant during the hearing, that good cause has been shown to revoke registrant's permit to carry a handgun. This decision hereby terminates Registrant's right to possess and carry a weapon such as the handgun he had previously carried, and he is barred from resuming certification at any time in the future.

This Court notes, in conclusion, that defense argued, in its opening and summation, that had the Registrant been charged with a criminal offenses arising from these incidents, his conduct would have been completely justified under the affirmative defense of self defense and/or defense of others. It was Registrant's position that his conduct was necessary and justified in light of the danger he claims to have been confronted with during each of the three incidents outlined above. While the argument made is interesting, the Court fails to find it relevant, as the case at bar was not a criminal proceeding. This proceeding is of a civil nature allowing for the termination of Registrant's right to possess a permit to carry a handgun, and to carry that weapon. The Court finds, by a preponderance of the evidence, and even to the extent of clear and convincing evidence, the State has carried its burden of proving that good cause has been shown for the result mentioned above. The Court concludes that it is in the best interest of the public that Registrant not be permitted to carry a handgun in the future and that he perform whatever good deeds he can for society as a retired police officer as can be accomplished without the use of a handgun.

Prior to hearing the proofs and making his fact finding, the judge rendered a written opinion denying Andros' motion to dismiss on the grounds that the State was preempted from revoking the license under *N.J.S.A.* 2C:39–6L(6) which provides:

A judge of the Superior Court may revoke a retired officer's privilege to carry a handgun pursuant to this subsection for good cause shown on the application of any interested person. A person who becomes subject to any of the disabilities set forth in subsection c. of *N.J.S.A.* 2C:58–3 shall surrender, as prescribed by the superintendent, his identification card issued under paragraph (4) of this subsection to the chief law enforcement officer of the municipality wherein he resides or the superintendent, and shall be permanently disqualified to carry a handgun under this subsection.

The judge concluded:

Thus, in light of the "narrow reading" standard set forth in [*Cipollone v. Liggett Group, Inc.*, 505 *U.S.* 504, 112 *S.Ct.* 2608, 120 *L.Ed.*2d 407 (1992),] *N.J.S.A.* 2C:39–6L remains valid after the passage of HR 218. *N.J.S.A.* 2C:39–6L(6) does not conflict with HR 218. *N.J.S.A.* 2C:39–6L(6) does not completely bar a retired New Jersey law enforcement officer from carrying a concealed weapon. As long as a retired law enforcement officer meets New Jersey's qualification standards, he or she is free to carry a concealed firearm in New Jersey. *N.J.S.A.* 2C:39–6L does not prevent retired officers from other States, qualified in their respective States

and possessing proper identification, from carrying concealed weapons in New Jersey. Thus, the intent of Congress in enacting HR 218 is not violated by *N.J.S.A.* 2C:39–6L(6).

■ We summarily reject Andros' attack on the fact finding. Whether based on one or two events alone or in the aggregate, there was "good cause" for revocation of the license under *N.J.S.A.* 29:39–6L(6),[4] provided it could do so without violating 18 *U.S.C.A.* 926C which provides:

(a) Notwithstanding any other provision of the law of any State or any political subdivision thereof, an individual who is a qualified retired law enforcement officer and who is carrying the identification required by subsection (d) may carry a concealed firearm that has been shipped or transported in interstate or foreign commerce, subject to subsection (b).

(b) This section shall not be construed to supersede or limit the laws of any State that—

(1) permit private persons or entities to prohibit or restrict the possession of concealed firearms on their property; or

(2) prohibit or restrict the possession of firearms on any State or local government property, installation, building, base, or park.

(c) As used in this section, the term "qualified retired law enforcement officer" means an individual who—

(1) retired in good standing from service with a public agency as a law enforcement officer, other than for reasons of mental instability;

(2) before such retirement, was authorized by law to engage in or supervise the prevention, detection, investigation, or prosecution of, or the incarceration of any person for, any violation of law, and had statutory powers of arrest;

(3)(A) before such retirement, was regularly employed as a law enforcement officer for an aggregate of 15 years or more; or

(B) retired from service with such agency, after completing any applicable probationary period of such service, due to a service-connected disability, as determined by such agency;

(4) has a nonforfeitable right to benefits under the retirement plan of the agency;

(5) during the most recent 12–month period, *has met,* at the expense of the individual, *the State's standards for training and qualification for active law enforcement officers to carry firearms;*

---

4 The first paragraph of *N.J.S.A.* 2C:39–6L expressly recognizes the federal "Law Enforcement Officers Safety Act of 2004" as a basis for maintaining licensure.

(6) is not under the influence of alcohol or another intoxicating or hallucinatory drug or substance; and

(7) is not prohibited by Federal law from receiving a firearm.

(d) The identification required by this subsection is—

. . . .

(emphasis added)

■ It is conceded that appellant satisfied the requirements of the federal act. But a retired officer's conduct permits the licensing state to revoke the permit, as evidenced by the requirements for qualification and testing every year. *See U.S.C.A.* 926C(c)(5). In other words, the federal act expressly permits states to set "standards for training and qualification" consistent with those of "active law enforcement officers." Otherwise, a retired officer who suffers from a disability or inability to satisfy those standards would be able to continue to carry firearms.

■ We thus agree with the opinion of Judge Neustadter that the federal act merely preempts a state's ability to preclude, or change the requirements for, carrying the firearm interstate, if the state of former employment permits licensing of the retired officer. Thus, as the judge said, New Jersey "retains jurisdiction to hear the State's contention that it can establish 'good cause' justifying the revocation." In fact, prior to adoption of the 2004 Act, a federal court in a removal action noted that the Gun Control Act of 1968, 18 *U.S.C.A.* § 922, *et seq.,* was designed to have preemptive effect only where there is "a direct and positive conflict" when state law and the federal statute "cannot be reconciled." *City of Gary v. Smith & Wesson Corp.,* 94 *F.Supp.*2d 947, 951 (D.Ind.2000) (quoting 18 *U.S.C.A.* § 927).[5] This is not such a case.

■ Federal preemption recognizes the "assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of

---

5 Sections 926 and 927 are both part of Chapter 44 of Title 18 relating to firearms.

Congress." *City of Columbus v. Ours Garage & Wrecker Service, Inc.*, 536 *U.S.* 424, 432, 122 *S.Ct.* 2226, 2232, 153 *L.Ed.*2d 430, 440 (2002) (internal quotations omitted). *See also, Nixon v. Mo. Mun. League*, 541 *U.S.* 125, 140, 124 *S.Ct.* 1555, 1565, 158 *L.Ed.*2d 291, 305 (2004). Even where there is express preemption, the United States Supreme Court has narrowly interpreted "such an express command" based on this "presumption against the pre-emption of state police power regulations." *Medtronic, Inc. v. Lohr*, 518 *U.S.* 470, 485, 116 *S.Ct.* 2240, 2250, 135 *L.Ed.*2d 700, 715 (1996) (citing *Cipollone v. Liggett*, 505 *U.S.* 504, 518, 523, 112 *S.Ct.* 2608, 2618, 120 *L.Ed.*2d 407, 424 (1992)). Moreover, the analysis of the scope of preemption is guided by "the purpose of Congress" in passing the statute, *id.* at 485–86, 116 *S.Ct.* at 2250, 135 *L.Ed.*2d at 716, and this Congressional intent is derived not only from the language of the statute, but from the " 'statutory framework' surrounding it." *Id.* at 486, 116 *S.Ct.* at 2250–51, 135 *L.Ed.*2d at 716 (citing *Gade v. Nat'l Solid Wastes Mgmt. Assn.*, 505 *U.S.* 88, 111, 112 *S.Ct.* 2374, 2390, 120 *L.Ed.*2d 73, 93 (1992)). *See also, Bates v. Dow Agrosciences L.L.C.*, 544 *U.S.* 431, 449, 125 *S.Ct.* 1788, 1801, 161 *L.Ed.*2d 687, 706 (2005).

With these principles in mind, we find no Congressional intent to preclude the action taken by the State in this case, and no basis for concluding that a state cannot revoke a handgun permit because Congress authorizes a carrier when licensed in one state to possess it in another state. Andros has submitted references to the Congressional Record in which speakers opposed the legislation and addressed adverse effects on the states. However, when seeking to determine legislative intent, the United States Supreme Court has stated that "[t]he fears and doubts of the opposition are no authoritative guide to the construction of legislation." *Shell Oil Co. v. Iowa Dept. of Revenue*, 488 *U.S.* 19, 29, 109 *S.Ct.* 278, 284, 102 *L.Ed.*2d 186, 198 (1988) (quoting cases). Andros has submitted no legislative history which warrants a conclusion that section 926C was designed to preempt the action taken by the State in this case.

The order revoking the permit to carry a handgun is affirmed.